UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DEVIN DWYER,                                    *
                                                *   CIVIL DOCKET NUMBER:  26-157
Plaintiff                                       *
                                                *   SECT:
VERSUS                                          *
                                                *
GERALD STICKER, IN HIS                          *   JUDGE:
OFFICIAL CAPACITY AS SHERIFF                    *
OF TANGIPAHOA PARISH; TURN                      *   MAG:
KEY HEALTH CLINICS, LLC; EMT                    *
RORY RICKS; LPN BRANDI JONES;                   *
SERITA GOODLY; TAMMIE                           *
WALGAMOTTE; SAVANNAH                            *
CLARK; ELIZABETH SIMS; AND                      *
DR. MICHAEL DAY,                                *

        Defendants.

*******************************

**COMPLAINT**

1.    Plaintiff **DEVIN DWYER** hereby files this complaint against the above-named

Defendants based on (1) unreasonably dangerous conditions at the Tangipahoa Parish Jail that

caused him to fall and break his ankle and (2) a failure to treat his broken ankle after the fall,

leading to a malunion of the bone.  Because of the failure to treat his broken ankle, the Plaintiff

later had to receive a traumatic and painful surgery to repair the improperly healed bone.  The

Plaintiff continues to suffer complications and impairment to his ankle based on the Defendants'

negligence and deliberate indifference to his medical needs.

**I. JURISDICTION**

2.    This action is brought pursuant to 42 U.S.C. §§ 1983.  Jurisdiction is founded on 28

U.S.C. §§ 1331 and 1343, and the Eighth and Fourteenth Amendments to the Constitution of the

United States.  Plaintiff also invokes supplemental jurisdiction over claims under state law,

pursuant to 28 U.S.C. § 1367.

1

## II. PARTIES

### (Plaintiff)

3.      **DEVIN DWYER** is an adult citizen residing in the State of Louisiana.

### (Defendants)

4.      **GERALD STICKER,** who is sued in his official capacity as Sheriff of Tangipahoa Parish, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana.  At all times described herein, he was the Sheriff of Tangipahoa Parish and, as such, was responsible for all activities at the Tangipahoa Parish Jail ("TPJ"), a facility under his control.  He was ultimately responsible for the supervision, administration, policies, practices, customs, and operations of the TPJ, including the provision of medical care there.  He was and is a final policy maker, and at all pertinent times was acting under color of law.

5.      **TURN KEY HEALTH CLINICS, LLC ("TURN KEY")**, is a foreign corporation doing business in the State of Louisiana.  At all relevant times, it was the entity with which the Sheriff of Tangipahoa Parish contracted to provide medical services to inmates at the TPJ.  **TURN KEY** was responsible for the provision of all medical care at the TPJ and the staffing, training, policies and procedures for all medical and mental health personnel at TPJ during the relevant time.

6.      **EMT RORY RICKS**, **LPN BRANDI JONES**, **SERITA GOODLY**, **TAMMIE WALGAMOTTE** and **SAVANNAH CLARK**, who are sued in their individual capacities, are adult citizens of the State of Louisiana and on information and belief domiciled in the Eastern District of Louisiana.  At all pertinent times, Defendants **RICKS, JONES, GOODLY, WALGAMOTTE,** and **CLARK** were employed by Defendant **TURN KEY** as medical staff

providing care to inmates at TPJ.  These Defendants were acting in the course and scope of their employment and under color of law at all relevant times herein.

7.      **ELIZABETH SIMS** is an adult citizen of the State of Louisiana who on information and belief is domiciled in the Eastern District of Louisiana.  She is sued in her individual capacity. On information and belief, **SIMS** was employed by **TURN KEY** as the Health Services Administrator ("HSA") at the TPJ.  As the HSA, it is believed that **SIMS** was responsible for the development of policies and practices for the delivery of health care to inmates at the TPJ.  It is further believed that she was responsible for training **TURN KEY** employees at the TPJ, including the individual Defendants named in Paragraph 6, and for ensuring that such employees followed the policies and practices established for delivery of health care at TPJ.  At all relevant times herein, **SIMS** was acting under color of law and was in the course and scope of her employment with **TURN KEY**.

8.      **DR. MICHAEL DAY** is an adult citizen of the State of Louisiana who on information and belief is domiciled in the Eastern District of Louisiana.  On information and belief, **DAY** was employed by **TURN KEY** to provide emergency and non-emergency treatment to inmates at TPJ.  At all relevant times herein, **DAY** was acting under color of law and was in the course and scope of his employment with **TURN KEY**.

### III. FACTUAL ALLEGATIONS

9.      In January 2025, Plaintiff **DWYER** was being held at the Tangipahoa Parish Jail as a result of a violation of previously imposed probation.

10.     There were extensive leaks occurring in the roof of the dorm where the Plaintiff was being held at TPJ.  Defendant **SHERIFF STICKER** and/or his employees at the jail were aware of this problem, which was causing a substantial amount of water to accumulate on the floors of

the dorm. These conditions caused the floors to be unreasonably and dangerously slippery to the inmates housed in the dorm. However, instead of moving the inmates to a safer place, **STICKER** and his employees left the inmates in the dorm to fend for themselves in the unreasonably dangerous conditions.

11.    On January 19, 2025, the Plaintiff slipped and fell because of the wet floors in the dorm. He severely broke his right ankle in the fall. Specifically, he suffered a lateral malleolar fracture of his ankle.

12.    The Plaintiff started trying to get medical help for his injury when he realized how serious it was. He and other inmates tried banging on the glass of the dorm windows to signal the guards, who rarely entered the dorms at TPJ. He also submitted an emergency sick call request to the medical staff via the jail's kiosk system on January 20th, advising that he had slipped and fallen and believed his ankle was broken.

13.    Despite the seriousness of his injury, the Plaintiff was not seen by medical personnel until the next day, January 21st. He reported that he was in extreme pain and could not put weight on his ankle and was experiencing loss of mobility. The medical staff noted high levels of swelling and bruising in the ankle, that it was warm to the touch, and that it was slightly discolored— all signs that the ankle was broken.

14.    Medical personnel could have routed him to the hospital for evaluation and treatment of his serious ankle injury at that time. Instead, the medical staff prescribed him Ibuprofen, wrapped and iced his ankle, and scheduled him for an X-ray to be completed at the jail on January 23, 2025.

15.    Defendant **DR. MICHAEL DAY** was notified of the Plaintiff's injury on January 21st and was aware that the Plaintiff was scheduled to be X-rayed on January 23rd.

16.     On January 23rd, however, Defendant **EMT RORY RICKS** falsified a medical refusal form stating that the Plaintiff was refusing to have his ankle X-rayed.  In truth, the Plaintiff never declined to have his ankle X-rayed.  Instead, Defendant **RICKS** forged the Plaintiff's signature on the form stating that the Plaintiff was refusing medical treatment on January 23rd.

17.     The Plaintiff was finally taken to the room at the jail where X-rays were conducted on January 25, 2025.  Several X-rays of his right ankle were taken.  On information and belief, Defendant **ELIZABETH SIMS** was present for and/or conducted the X-rays.  These X-rays were transmitted to a diagnostic service company that same day.

18.     In the early morning hours of January 26, 2025, the doctor for the diagnostic company completed a report stating that the X-rays showed a lateral malleolar fracture in the Plaintiff's right ankle.  On information and belief, this report was transmitted back to **TURN KEY** personnel at the TPJ on that same date.

19.     Despite receiving the report showing the fracture in the Plaintiff's right ankle, none of the **TURN KEY** Defendants took any action to address the Plaintiff's condition, which obviously required additional medical care beyond ice and Ibuprofen.  Indeed, Plaintiff should have been routed to a hospital immediately to receive care from an orthopedic doctor.  Instead, it appears that no one reviewed the report when it was received, or, if they did review it, those individuals failed to take any action in response to the report.

20.     On information and belief, Defendants **SIMS** and **DAY** were both aware that the Plaintiff had been X-rayed on January 25th because of his ankle injury.  Both these Defendants should have reviewed the X-ray report and taken steps to provide additional treatment for the Plaintiff's ankle.  However, both **SIMS** and **DAY** either failed to review the report or, if they did review it, they failed to take action to provide the Plaintiff appropriate treatment for the broken ankle.

21. On January 27, 2025, the Plaintiff twisted his right ankle again as he was getting out of bed, because the ankle was unstable from the untreated break. The Plaintiff could not put any weight on the ankle after this episode, and a "man down" call was sent to the medical department.

22. Defendant **RICKS** responded to the "man down" call. Defendant **RICKS** wrapped the Plaintiff's ankle again and scheduled him for an X-ray.

23. However, on January 30th, **RICKS** cancelled this X-ray request because he learned that the X-ray had already been conducted on January 25th. On information and belief, **RICKS** also learned on this date that the X-ray showed that the Plaintiff's ankle was broken. Despite this knowledge, **RICKS** failed to take any action to address the situation.

24. Despite his requests for information around this time, the Plaintiff was not told that the X-ray showed that the ankle was broken.

25. The Plaintiff received his last dose of Ibuprofen on or about January 31, 2025, and he was kept in the dark about his condition, ie. that his ankle was broken, until February 28, 2025.

26. On February 15, 2025, the Plaintiff submitted another sick call because his ankle was still swollen and very painful and did not seem to be healing correctly.

27. On February 16, 2025, Defendant **LPN BRANDI JONES** examined the Plaintiff in response to his sick call the previous day. Defendant **JONES** noted the swelling in the Plaintiff's ankle and that he had difficulty walking. Defendant **JONES** authorized the Plaintiff to receive Ibuprofen for the continuing pain in his ankle. However, the Plaintiff was never given any Ibuprofen or any other type of treatment for his ankle as a result of this encounter.

28. On February 17, 2025, Defendant **JONES** reviewed the Plaintiff's medical records and apparently discovered (if she was not already aware of it) the X-ray report showing that his ankle

was in fact broken.  **JONES** did not advise the Plaintiff of this finding, nor did she contact the on-call doctor for the jail to receive instructions on how to treat the injury.

29.     According to records, **JONES** scheduled a "Priority 1" "urgent referral" in response to her discovery of the X-ray showing the Plaintiff's broken ankle.  However, no treatment was provided in response to this "urgent referral," and the Plaintiff was never referred to an outside medical provider.

30.     Instead, over the course of the next eleven days, Defendants **GOODLY**, **WALGAMOTTE** and **CLARK** each also became aware that the Plaintiff's ankle was broken—assuming these Defendants were not already aware of this fact—because each of these Defendants reviewed the entry in the medical records that **JONES** had made regarding the Plaintiff's broken ankle.  Each of these Defendants caused the Plaintiff's "urgent referral" to be delayed and rescheduled.  Defendant **JONES** also delayed and rescheduled the "urgent referral" during this time.  Furthermore, each of these Defendants failed to provide any treatment during this time for the Plaintiff's broken ankle, or to take appropriate steps to make sure this urgent "Priority 1" referral occurred.

31.     Defendant **RICKS**, who on information and belief was already aware of the Plaintiff's broken ankle, also became aware of the "urgent referral" during this time, as he viewed it in the system.  However, he also failed to take steps to make sure it happened and instead caused further delays and rescheduling.  Furthermore, he also failed to provide any treatment to the Plaintiff during this eleven-day period.

32.     Finally, on February 28, 2025, the Plaintiff was seen by Defendant **SIMS**, the health services administrator at the jail.  Defendant **SIMS** told the Plaintiff that his ankle had in fact been broken on January 19, 2025.  This was the first time that the Plaintiff had been provided

7

this information.  **SIMS** further advised that because of the delay in providing necessary and appropriate treatment, the bones in the ankle had probably healed improperly and were likely in malunion, leading to the continued pain and disability in the ankle that the Plaintiff was experiencing.

33.    It was not until the February 28th appointment that Plaintiff started to receive additional pain medication and bandages to address the pain and disability he had been experiencing in his ankle because of the untreated broken bone.

34.    On March 3, 2025, the Plaintiff was transferred out of the TPJ to the St. Tammany Parish Jail.  The medical staff at St. Tammany sent him to University Medical Center for treatment of his ankle.  There, doctors diagnosed a malunion of the bones in the ankle because of the failure to treat it in a timely manner after the break.  Eventually, the Plaintiff had to undergo surgery to repair the malunion in his ankle.

35.    The Plaintiff continues to suffer pain, stiffness, and disability in his ankle.

36.    All of the Defendants are liable to the Plaintiff for compensatory and punitive damages.

37.    All of the Defendants are liable jointly, severally, and in solido for the Plaintiff's injuries.

38.    As alleged below, the Defendants' actions were reckless, willful, wanton, and malicious, and constitute deliberate indifference to the rights of the Plaintiff.  In the alternative, the Defendants' actions were negligent.

## IV. CAUSES OF ACTION

39.    Plaintiff repeats and re-alleges each and every allegation of the complaint.

40.    *Constitutional Violations*. The individual Defendants, **EMT RORY RICKS**, **LPN BRANDI JONES**, **SERITA GOODLY**, **TAMMIE WALGAMOTTE**, **SAVANNAH CLARK**, **ELIZABETH SIMS**, and **DR. MICHAEL DAY**, acting individually and together,

8

under color of law, violated the Plaintiff's right to adequate medical care while he was held in custody, as protected by the Eighth and Fourteenth Amendments of the United States Constitution.  At all pertinent times, these Defendants, acting individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional and civil rights of Plaintiff.  Accordingly, these Defendants are liable to the Plaintiff under 42 U.S.C. § 1983.

41.     *State Law Torts Against Defendants* **EMT RORY RICKS**, **LPN BRANDI JONES**, **SERITA GOODLY**, **TAMMIE WALGAMOTTE**, **SAVANNAH CLARK**, **ELIZABETH SIMS**, and **DR. MICHAEL DAY**.  The above-described actions and inactions of these Defendants, who were healthcare professionals charged with care of the Plaintiff, fell beneath the applicable standard of care for such professionals and resulted in serious harm to the Plaintiff. These Defendants are therefore liable to the Plaintiff for their negligence.

42.     *First state law claim against Defendant* **SHERIFF STICKER**.  At all times relevant hereto, Defendant **SHERIFF STICKER** had a duty to maintain the premises of the jail in a reasonably safe condition for the inmates who were in his care, custody, and control.  As alleged above, **SHERIFF STICKER** breached that duty by housing the Plaintiff in a dorm with a leaking roof that caused the floor of the dorm to become unreasonably dangerous, hazardous and slippery.  The Plaintiff was injured as a result of this unreasonably dangerous condition, of which **SHERIFF STICKER** was aware but which he failed to address.  Defendant **STICKER** is therefore liable to the Plaintiff for this negligence.

43.     *Second state law claim against Defendant* **SHERIFF STICKER**.  As the Sheriff of Tangipahoa Parish, **SHERIFF STICKER** was ultimately responsible for ensuring that inmates held in custody at TPJ received constitutionally adequate health care while incarcerated.  As

9

described above, the Plaintiff did not receive adequate health care while he was in the custody of Defendant **SHERIFF STICKER**.  On information and belief, **SHERIFF STICKER** was on notice that the health care being provided to inmates by Defendant **TURN KEY** and its employees at TPJ was inadequate in various ways.  Accordingly, **SHERIFF STICKER** is liable for his negligent failure to ensure that inmates at TPJ were provided adequate health care while they were incarcerated.

44.   *State law claim against Defendant **TURN KEY**.*  At all relevant times, Defendants **EMT RORY RICKS**, **LPN BRANDI JONES**, **SERITA GOODLY**, **TAMMIE WALGAMOTTE**, **SAVANNAH CLARK**, **ELIZABETH SIMS**, and **DR. MICHAEL DAY** were acting in the course and scope of their employment with Defendant **TURN KEY**.  The doctrine of respondeat superior therefore applies to the state-law torts alleged in this Complaint against these Defendants, and Defendant **TURN KEY** is liable to the Plaintiff for the tortious acts of its employees.

## V. DAMAGES

45.   As a result of the above-described civil rights violations and violations of state law, Plaintiff **DEVIN DWYER** suffered physical injuries, mental and emotional pain and suffering, anguish and distress, medical expenses, and lost wages, all as will be determined at a trial of this matter.

46.   In addition to recovering damages, Plaintiff **DWYER** seeks reasonable attorneys' fees in accordance with 42 U.S.C. § 1988, plus judicial interest, and for the Defendants to bear all costs of these proceedings.

## VI. PRAYER FOR RELIEF

47.     WHEREFORE, the Plaintiff, **DEVIN DWYER**, prays the Defendants be duly cited and served copies of the above and foregoing, made to timely appear and answer, that the Court exercise its supplemental jurisdiction over state law claims, and after due proceedings are had there be a judgment in his favor and against all Defendants, holding them liable jointly, severally, and in solido as follows:

      a.     Compensatory and punitive damages alleged herein, together with judicial interest,

      b.     All attorneys' fees as provided in 42 U.S.C. §1988, and that the Defendants bear all costs of these proceedings and all legal interest

      c.     All further legal, equitable, and general relief available.

Respectfully submitted,

/s/ Stephen J. Haedicke

_____

**STEPHEN J. HAEDICKE** (Bar Roll No. 30537)
1040 St. Ferdinand St.
New Orleans, LA 70117
(504)291-6990 Telephone
(504)291-6998 Fax
stephen@haedickelaw.com